Shaw, C. J.
The witness was asked whether he had a personal knowledge of the defendant’s handwriting; and stated that he had. His experience qualifies him to say this. Papers have passed under his notice, in a business or official capacity, which have given him a long and familiar acquaintance with the defendant’s handwriting. He seems, therefore, competent to give an opinion in regard to it, independent of any skill of his own as a penman, or as a judge of penmanship.
In regard to the term “ handwriting,” we think that it should include, generally, whatever the party has written with his hand, and not merely his common and usual style of chirography. This question of proof of handwriting most commonly-arises and is discussed in cases of forgery. But there are other cases, in which the evidence of experts is applied to handwriting; as, in prosecutions for threatening letters, or for arson. There the question is generally made, that they are not genuine, on the part of the person purporting to send them, but simulated and disguised ; and the proof shows that the writer did not seek to imitate a hand, but to depart, as far as possible, from his own. The evidence has always been considered admissible in these instances.
The witness then testified that he thought .the letters were in the defendant’s handwriting, and was permitted by the court, against the objection of the defendant’s counsel, to state his reasons for his opinion.
He further testified that, in his opinion, one of the letters, as well as an erasure on the envelope of one of the others, could not have been written with a pen, or done with a brush.
The counsel for the commonwealth then produced a small pine stick, about six inches long, and as large as a goose quill, and having a small wad of cotton which had been dipped in ink wound round one end and tied on with a string; which instrument was proved to have been found in the defendant’s laboratory. And the witness was asked, whether the erasure *302 on the inside of the envelope was made with this instrument; or how it was made.
The defendant’s counsel objected.
Shaw, C. J.
We think the witness’s opinion quite inadmissible. The fact, that such an instrument was found, has already been proved; but opinion, as to its possible use, would be liable to great objection.
The defendant’s counsel contended, that the fourth count of the indictment did not describe the offence alleged therein fully and plainly, substantially and formally, and was insufficient ; and that the mode of pleading adopted would give rise to great confusion, contravene many established rules, and lead to an indefinite multiplication of issues ; Mass. Const. Part I. Art. XII.; Hawk. P. C., B. 2, c. 23, § 84; East, P. C. c. 5, § 107; 3 Chit. Crim. L. 734; 1 Russ. Cr. 557; Rex v. Kelly, Moody, C. C. 113; Rex v. Thompson, Moody, C. C. 139; Rex v. Martin, 5 Car. & P. 128; and that this case was distinguishable from People v. Colt, 3 Hill, 432, in which the allegation was, that the defendant murdered the deceased by means of striking and cutting him with some instrument, to the jury unknown ; for there the means were alleged, namely, striking and cutting, and the instrument only, (which is immaterial,) was laid as unknown. And, to show the rules by which circumstantial evidence must be governed, they cited 1 Stark. Ev. (5th Am. ed.) 446, 447; Best on Presump. 282, Wills, Circ. Ev. 187.
Much evidence was introduced on the part of the defendant to prove that his general character and reputation was that of a peaceable and humane man.
Several witnesses, called for the defence, testified that they saw Dr. Parkman at various places in Boston, at different times between the hours of a quarter before two and five, in the afternoon of the 23d of November.
The attorney-general, in rebutting the evidence for the defendant, proposed to call witnesses to show that there was a person about the streets of Boston, at the time of Dr. Parkman’s disappearance, who bore a strong resemblance to him, in form, gait, and manner; so strong that he was approached *303 and spoken to, as Dr. Parkman, by persons well acquainted with the latter. The Court excluded the evidence, remarking that perhaps there might be no objection to the introduction of the very person supposed to be Dr. Parkman, but that this testimony of other persons, as to the resemblance of an unknown stranger, was quite too remote and unsatisfactory.
The opinion of the court on the law of the case was given m the charge to the jury as follows : —
Shaw, C. J.
Homicide, of which murder is the highest and most criminal species, is of various degrees, according to circumstances. The term, in its largest sense, is generic, embracing every mode by which the life of one man is taken by the act of another. Homicide may be lawful or unlawful; it is lawful when done in lawful war upon an enemy in battle ; it is lawful when done by an officer in the execution of justice upon a criminal, pursuant to a proper warrant. It may also be justifiable, and of course lawful, in necessary self-defence. But it is not necessary to dwell on these distinctions ; it will be sufficient to ask attention to the two species of criminal homicide, familiarly known as murder and manslaughter.
In seeking for the sources of our law upon this subject, it is proper to say, that whilst the statute law of the commonwealth declares (Rev. Sts. c. 125, § 1,) that “ Every person who shall commit the crime of murder shall suffer the punishment of death for the same; ” yet it nowhere defines the crimes of murder or manslaughter, with all their minute and carefully-considered distinctions-and qualifications. For these, we resort to that great repository of rules, principles, and forms, the common law. This we commonly designate as the common law of England; but it might now be properly called the common law of Massachusetts. It was adopted when our ancestors first settled here, by general consent. It was adopted and confirmed by an early act of the provincial government, and was formally confirmed by the provision of the constitution (ch. 6, art. 6,) declaring that all the laws which had theretofore been adopted, used, and approved, in the province or state of Massachusetts bay, and usually practised on in the courts of 'aw, should still remain and be in full force until altered or *304 repealed by the legislature. So far, therefore, as the rules and principles of the common law are applicable to the administration of criminal law, and have not been altered and modified by acts of the colonial or provincial government or by the state legislature, they have the same force and effect as laws formally enacted.
By the existing law, as adopted and practised on, ^unlawful homicide is distinguished into murder and manslaughter.
Murder, in the sense in which it is now understood, is the killing of any person in the peace of the commonwealth, with malice aforethought, either express or implied by law. Malice, in this definition, is used in a technical sense, including not only anger, hatred, and revenge, but every other unlawful and unjustifiable motive. It is not confined to ill-will towards one or more individual persons, but is intended to denote an action flowing from any wicked and corrupt motive, a thing done malo anima, where the fact has been attended with such circumstances, as cony in them the plain indications of a heart regardless of social duty, and fatally bent on mischief. And therefore malice is implied from any deliberate or cruel act against another, however sudden.
Manslaughter is the unlawful killing of another without malice ; and may be either voluntary, as when the act is committed with a. real design and purpose to kill, but through the violence of sudden passion, occasioned by some great provocation, which in tenderness for the frailty of human nature the law considers sufficient to palliate the criminality of the offence ; or involuntary, as when the death of another is caused by some unlawful act, not accompanied by any intention to take life.
From these two definitions, it will be at once perceived, that the characteristic distinction between murder and manslaughter is malice, express or implied. It therefore becomes necessary, in every case of homicide proved, and in order to an intelligent inquiry into the legal character of the act, to ascertain with some precision the nature of legal malice, and what evidence is requisite to establish its existence.
Upon this subject, the rule as deduced from the authorities *305 is, that the implication of malice arises in every case of intentional homicide; and, the fact of killing being first proved, all the circumstances of accident, necessity, or infirmity, are to be satisfactorily established by the party charged, unless they arise out of the evidence produced against him to prove the homicide, and the circumstances attending it. If _ there are, in fact, circumstances of justification, excuse, or palliation, such proof will naturally indicate them. But where the fact of killing is proved by satisfactory evidence, and there are no circumstances disclosed, tending to show justification or excuse, there is nothing to rebut the natural presumption of malice. This rule is founded on the plain and obvious principle, that a person must be presumed to intend to do that which he voluntarily and wilfully does in fact do, and that he must intend all the natural, probable, and usual consequences of his own acts. Therefore, when one person assails another violently with a dangerous weapon, likely to kill and which does in fact destroy the life of the party assailed, the natural presumption is, that he intended death or other great bodily harm; and, as there can be no presumption of any proper motive or legal excuse for such a cruel act, the consequence follows, that, in the absence of all proof to the contrary, there is nothing to rebut the presumption of malice. On the other hand, if death, though wilfully intended, was inflicted immediately after provocation given by the deceased, supposing that such provocation consisted of a blow or an assault, or other provocation on his part, which the law deems adequate to excite sudden and angry passion and create heat of blood, this fact rebuts the presumption of malice ; but still, the' homicide being unlawful, because a man is bound to curb his passions, is criminal, and is manslaughter.
In considering what is regarded as such adequate provocation, it is a settled rule of law, that no provocation by words only, however opprobrious, will mitigate an intentional homicide, so as to reduce it to manslaughter. Therefore, if, upon provoking language given, the party immediately revenges himself by the use of a dangerous and deadly weapon likely to cause death, such as a pistol discharged at the person, a *306 heavy bludgeon, an axe, or a knife; if death ensues, it is a homicide not mitigated to manslaughter by the circumstances, and so is homicide by malice aforethought, within the true definition of murder. It is not the less malice aforethought, within the meaning of the law, because the act is done suddenly after the intention to commit the homicide is formed; it. is sufficient that the malicious intention precedes and accompanies the act of homicide. It is manifest, therefore, that the words “ malice aforethought,” in the description of murder, do not imply deliberation, or the lapse of considerable time between the malicious intent to take life and the actual execution of that intent, but rather denote purpose and design, in contradistinction to accident and mischance.
In speaking of the use of a dangerous weapon, and the mode of using it upon the person of another, I have spoken of it as indicating an intention to kill him, or do him great bodily harm. The reason is this. Where a man, without justification or excuse, causes the death of another by the intentional use of a dangerous weapon likely to destroy life, he is responsible for the consequences, upon the principle already stated, that he is liable for the natural and probable consequences of his act. Suppose, therefore, for the purpose of revenge, one fires a pistol at another, regardless of consequences, intending to kill, maim, or grievously wound him, as the case may be, without any definite intention to take his life; yet, if that is the result, the law attributes the same consequences to homicide so committed, as if done under an actual and declared purpose to take the life of the party assailed.
I propose to verify and illustrate these positions, by reading a few passages from a work of good authority on this subject, a work already cited at the bar, East’s Pleas of the Crown, c 5, §§ 2, 4, 12, 19, 20.
“ Murder is the voluntary killing of any person of malice prepense or aforethought, either express or implied by law; the sense of which word malice is not only confined to a particular ill-will to the deceased, but is intended to denote, as Mr. Justice Foster expresses it, an action flowing from a wicked *307 and corrupt motive, a thing done malo ammo, where the fact has been attended with such circumstances as carry in them the plain indications of a heart regardless of social duty and fatally bent upon mischief. And therefore malice is implied from any deliberate, cruel act against another, however sudden.” § 2.
“ Manslaughter is principally distinguishable from murder in this; that though the act which occasions the death be unlawful, or likely to be attended with bodily mischief, yet the malice, either express or implied, which is the very essence of murder, is presumed to be wanting; and, the act being imputed to the infirmity of human nature, the correction ordained for it is proportionally lenient.” § 4.
“ The implication of malice arises in every instance of homicide amounting, in point of law, to murder; and in every charge of murder, the fact of killing being first proved, all the circumstances of accident, necessity, or infirmity, are to be satisfactorily proved by the prisoner, unless they arise out of the evidence produced against him.” § 12.
“ Whenever death ensues from sudden transport of passion or heat of blood, if upon a reasonable provocation and without malice, or if upon sudden combat, it will be manslaughter; if without such provocation, or the blood has had reasonable time or opportunity to cool, or there be evidence of express malice, it will be murder.” § 19.
“ Words of reproach, how grievous soever, are not provocation sufficient to free the party killing from the guilt of murder ; nor are contemptuous or insulting actions or gestures, without an assault upon the person; nor is any trespass against lands or goods. This rule governs every case, where the party killing upon such provocation made use of a deadly weapon, or otherwise manifested an intention to kill, or to do some great bodily harm. But if he had given the other a box on the ear, or had struck him with a stick, or other weapon not likely to kill, and had unluckily and against his intention killed him, it had been but manslaughter.” § 20.
The true nature of manslaughter is, that it is homicide mitigated out of tenderness to the frailty of human nature Eveiv *308 man, when assailed with violence or great rudeness, is inspired with a sudden impulse of anger, which puts him upon resistance before time for cool reflection ; and if, during that period, he attacks his assailant with a weapon likely to endanger life, and death ensues, it is regarded as done through heat of blood or violence of anger, and not through malice, or that coldblooded desire of revenge which more properly constitutes the feeling, emotion, or passion of malice.
The same rule applies to homicide in mutual combat, which is attributed to sudden and violent anger occasioned by the combat, and not to malice. When two meet, not intending to quarrel, and angry words suddenly arise, and a conflict springs up in which blows are given on both sides, without much regard to who is the assailant, it is a mutual combat. And if no unfair advantage is taken in the outset, and the occasion is not sought for the purpose of gratifying malice, and one seizes a weapon and strikes a deadly blow, it is regarded as homicide in heat of blood; and though not excusable, because a man is bound to control his angry passions, yet it is not the higher offence of murder.
We have stated these distinctions, not because there is nuch evidence in the present case which calls for their application, but that the jury may have a clear and distinct view of the leading principles in the law of homicide. There seems to have been little evidence in the present case that the parties had a contest. There is some evidence tending to show the previous existence of angry feelings; but unless these feelings resulted in angry words, and words were followed by blows, there would be no proof of heat of blood in mutual combat, or under provocation of an assault, on the one side or the other; and the proof of the defendant’s declarations, as to the circumstances under which the parties met and parted, as far as they go, repel the supposition of such a contest.
With these views of the law of homicide, we will proceed to the further consideration of the present case. The prisoner at the bar is charged with the wilful murder of Dr. George Parkman. This charge divides itself into two principal questions, to be resolved by the proof: first, whether the party a lleged *309 to have been murdered came to his death by an act of violence inflicted by any person ; and if so, secondly, whether the act was committed by the accused.
Under the first head we are to inquire and ascertain, whelher the party alleged to have been slain is actually dead; and, if so, whether the evidence is such as to exclude, beyond reasonable doubt, the supposition that such death was occasioned by accident or suicide, and to show that it must have been the result of an act of violence.
When the dead body of a person is found, whose life seems to have been destroyed by violence, three questions naturally arise. Did he destroy his own life ? Was his death caused by accident ? Or was it caused by violence inflicted on him by others ? In most instances, there are facts and circumstances surrounding the case, which, taken in connection with the age, character, and relations of the deceased, will put this beyond doubt. It is with a view to this, and in consequence of the high value which the law places upon the life of every individual under its protection, that provision is made for a prompt inquiry into such cases, prior to any question of guilt or innocence. The high and anxious regard of the law, for the protection and security of the life of the subject, pervades its whole system; and that upon the principles of simple humanity, without reference to the condition or circumstances of individuals. Indeed, you must have perceived, from the whole course of this trial, the extreme tenderness of the law for the rights of human life ; as well the life of the deceased, whose death is the subject of this trial, as that of the prisoner, whose own life is put in jeopardy by it. Hence, in case of a sudden and violent death, a coroner’s inquest is provided, in order to an inquiry into its true cause, whilst the facts are recent, and the circumstances unchanged. If, on such an inquiry, made by an officer appointed for the purpose, and by a jury acting upon evidence given on oath, it satisfactorily appears that the deceased came to his death by accident or a visitation of providence, the result will have a strong tendency to allay unjustifiable suspicion, and to satisfy and tranquillize the feelings of the vicinity and of the community at large, always *310 deeply interested in such an event. But if, as in the present case, the result of such an early inquiry tends to fasten suspicion on any individual as the guilty cause, then it naturally leads to other proceedings which may vindicate the law, and bring the suspected party to trial, and, if found guilty, to punishment.
The importance of this inquiry into the circumstances of a supposed violent death, and of collecting and preserving the proofs of them, will appear from the further consideration of the present case. It is one where the first important and leading fact, proved by uncontested evidence, is, that the person alleged to have been slain, Dr. Parkman, suddenly disappeared from his family and home on Friday the 23d of November last, without any cause known to them, and was never after-wards seen. The theory upon which the prosecution is founded, and to establish which evidence has been laid before you, is, that he was deprived of life in the afternoon of the day mentioned, under such circumstances as lead to a strong belief, that his death was caused by an act of violence and by human agency.
This case is to be proved, if proved at all, by circumstantial evidence; because it is not suggested that any direct evidence can be given, or that any witness can be called to give direct testimony, upon the main fact of the killing. It becomes important, therefore, to state what circumstantial evidence is ; to point out the distinction between that and positive or direct evidence; and to give some idea of the mode in which a judicial investigation is to be pursued by the aid of circumstantial evidence.
The distinction, then, between direct and circumstantial evidence, is this. Direct or positive evidence is when a witness can be called to testify to the precise fact which is the subject of the issue on trial; that is, in a case of homicide, that the party accused did cause the death of the deceased. Whatever may be the kind or force of the evidence, this is the fact to be proved. But suppose no person was present on the occasion of the death, and of course that no one can be called to testify to it; is it wholly unsusceptible of legal proof? Exneriencp *311 has shown that circumstantial evidence may be offered in such a case; that is, that a body of facts may be proved of so conclusive a character, as to warrant a firm belief of the fact, quite as strong and certain as that on which discreet men are accustomed to act, in relation to their most important concerns. It would be injurious to the best interests of society, if such proof could not avail in judicial proceedings. If it was necessary always to have positive evidence, how many criminal acts committed in the community, destructive of its peace and subversive of its order and security, would go wholly undetected and unpunished ?
The necessity, therefore, of resorting to circumstantial evidence, if it is a safe and reliable proceeding, is obvious and absolute. Crimes are secret. Most men, conscious of criminal purposes, and about the execution of criminal acts, seek the security of secrecy and darkness. It is therefore necessary to use all other modes of evidence besides that of direct testimony, provided such proofs may be relied on as leading to safe and satisfactory conclusions; and, thanks to a beneficent providence, the Jaws of nature and the relations of things to each other are so linked and combined together, that a medium of proof is often thereby furnished, leading to inferences and conclusions as strong as those arising from direct testimony.
On this subject, I will once more ask attention to a remark in the work already cited, East’s Pleas of the Crown, c. 5, § 11. “ Perhaps,” he says, “ strong circumstantial evidence, in cases of crimes like this, committed for the most part in secret, is the most satisfactory of any from whence to draw the conclusion of guilt; for men may be seduced to perjury by many base motives, to which the secret nature of the offence may sometimes afford a temptation; but it can scarcely happen that many circumstances, especially if they be such over which the accuser could have no control, forming together the links of a transaction, should all unfortunately concur to fix the presumption of guilt on an individual, and yet such a conclusion be erroneous.”
Each of these modes of proof has its advantages and disad *312 vantages; it is not easy to compare their relative value. The advantage of positive evidence is, that it is the direct testimony of a witness to the fact to be proved, who, if he speaks the truth, saw it done; and the only question is, whether he is entitled to belief. The disadvantage is, that the witness may be false and corrupt, and that the case may not afford the means of detecting his falsehood.
But,- in a case of circumstantial evidence where no witness can testify directly to the fact to be proved, it is arrived at by a series of other facts, which by experience have been found so associated with the fact in question, that in the relation of cause and effect, they lead to a satisfactory and certain conclusion ; as when footprints are discovered after a recent snow, it is certain that some animated being has passed over the snow since it fell; and, from the form and number of the footprints, it can be determined with equal certainty, whether they are those of a man, a bird, or a quadruped. Circumstantial evidence, therefore, is founded on experience and observed facts and coincidences, establishing a connection between the known and proved facts and the fact sought to be proved. The advantages are, that, as the evidence commonly comes from several witnesses and different sources, a chain of circumstances is less likely to be falsely prepared and arranged, and falsehood and perjury are more likely to be detected and fail of their purpose. The disadvantages are, that a jury has not only to weigh the evidence of facts, but to draw just conclusions from them; in doing which, they may be led by prejudice or partiality, or by want of due deliberation and sobriety of judgment, to make hasty and false deductions; a source of error not existing in the consideration of positive evidence.
From this view, it is manifest, that great care and caution ought to be used in drawing inferences from proved facts. It must be a fair and natural, and not a forced or artificial conclusion ; as when a house is found to have been plundered, and there are indications of force and violence upon the windows and shutters, the inference is that the house was broken open, and that the persons who broke open the house plundered the property. It has sometimes been enacted by positive *313 law, that certain facts proved shall be held to be evidence of another fact; as where it is provided by statute, that if the mother of a bastard child gives no notice of its expected birth and is delivered in secret, and afterwards is found with the child dead, it shall be presumed that it was born alive and that she killed it. This is a forced and not a natural presumption, prescribed by positive law, and not conformable to the rule of the common law. The common law appeals to the plain dictates of common experience and sound judgment; and the inference to be drawn from the facts must be a reasonable and natural one, and, to a moral certainty, a certain one. It is not sufficient that it is probable only: it must be reasonably and morally certain.
The next consideration is, that each fact which is necessary to the conclusion must be distinctly and independently proved by competent evidence. I say, every fact necessary to the conclusion; because it may and often does happen, that, in making out a case on circumstantial evidence, many facts are given in evidence, not because they are necessary to the conclusion sought to be proved, but to show that they are consistent with it and not repugnant, and go to rebut any contrary presumption. As in the present case, it was testified by a witness, that, the day before the alleged homicide, he saw Dr. Parkiran riding through Cambridge and inquiring for Dr. Webster’s house; this evidence had a slight tendency to show that he was then urgently pressing his claim; but not being necessary to the establishment of the main fact, if the witness was mistaken in the time or in the fact itself, such failure of proof would not prevent the inference from other facts, if of themselves sufficient to warrant it. The failure of such proof does not destroy the chain of evidence; it only fails to give it that particular corroboration, which the fact, if proved, might afford.
So to take another instance arising out of the evidence in the present case. The fact of the identity of the body of the deceased with that of the dead body, parts of which were found at the medical college, is a material fact, necessary to be established by the proof. Some evidence has been offered, tenu *314 ing to show, that the shape, size, height, and other particulars respecting the body, parts of which were found and put together, would correspond with those of the deceased. But, inasmuch as these particulars would also correspond with those of many other persons in the community, the proof would be equivocal and fail in the character of conclusiveness upon the point of identity. But other evidence was then offered, respecting certain teeth found in the furnace, designed to show that they were the identical teeth prepared and fitted for Dr. Parkman. Now, if this latter fact is satisfactorily proved, and if it is further proved to a reasonable certainty, that the limbs found in the vault and the burnt remains found in the furnace were parts of one and the same dead body, this would be a coincidence of a conclusive nature to prove the point sought to be established; namely, the fact of identity. Why, then, it may be asked, is the evidence of height, shape, and figure of the remains found, given at all ? The answer is, because it is proof of a fact not repugnant to that of identity, but^consistent with it, and may tend to rebut any presumption that the remains were those of any other person; and therefore, to some extent, aid the proof of identification. The conclusion must rest upon a basis of facts proved, and must be the fair and reasonable conclusion from all such facts taken together.
The relations and coincidences of facts with each other from which reasonable inferences may be drawn, are some oi a physical or mechanical, and others of a moral nature. Oí the former, some are so decisive as to leave no doubt; as where human footprints are found on the snow, (to use an illustration already adduced,) the conclusion is certain, that a person has passed there; because we know, by experience, that that is the mode in which such footprints are made. A man is found dead, with a dagger-wound in his breast; this being the fact proved, the conclusion is, that his death was caused by that wound, because we know that it is an adequate cause of death, and no other cause is apparent.
We may also take an instance or two from actual trials. A recent ease occurred in this court, where one was indicted for .murder by stabbing the deceased in the heart, with a dirk* *315 knife. There was evidence tending to show that the prisoner had possession of such a knife on the day of the homicide. On the next morning, the handle of a knife, with a small portion of the blade remaining, was found in an open cellar, near the spot. Afterwards, upon a post mortem examination of the deceased, the blade of a knife was found broken in his heart, causing a wound in its nature mortal. Some of the witnesses testified to the identity of the handle, as that of the knife previously in the possession of the accused. No one, probably, could testify to the identity of the blade. The question, therefore, stilV. remained, whether that blade belonged to that handle. Now, when these pieces came to be placed together, the toothed edges of the fracture so exactly fitted each other, that no person could doubt that they had belonged together; because, from the known qualities of steel, two knives could not have been broken in such a manner as to produce edges that would so precisely match.
So, an instance is mentioned of a trial before lord Eldon, when a common-law judge, where the charge was of murder with a pistol. There was much evidence tending to show that the accused was near the place at the time, and raising strong suspicions that he was the person who fired the pistol; but it fell short of being conclusive, — of fastening the charge upon the accused. The surgeon had stated in his testimony, that the pistol must have been 'fired near the body, because the body was blackened, and the wad found in the wound. It was asked, by the judge, if he had preserved that wad; he said he had, but had not examined it. On being requested to do so, he unrolled it carefully, and on an examination it was found to consist of paper, constituting part of a printed ballad; and the corresponding part of the same ballad, — as shown by the texture of the paper and the purport and form of stanza of the two portions, — was found in the pocket of the accused. This tended to identify the defendant as the person who loaded and fired the pistol.
These are cases where the conclusion is drawn from known relations and coincidences of a physical character. But there are those of a moral nature, from which conclusions may as *316 legitimately be drawn. The ordinary feelings, passions, and propensities under which parties act, are facts known by observation and experience; and they are so uniform in their operation, that a conclusion may be safely drawn, that if a person acts in a particular manner he does so under the influence of a particular motive. Indeed, this is the only mode in which a large class of crimes can be proved. I mean crimes, which consist not merely in an act done, but in the motive and intent with which they are done. But this intent is a secret of the heart, which can only be directly known to the searcher of all hearts; and if the accused makes no declaration on the subject, and chooses to keep his' own secret, which he is likely to do if his purposes are criminal, such criminal intent may be inferred, and often is safely inferred, from his conduct and external acts.
A few other general remarks occur to me upon this subject, which I will submit to your consideration. Where, for instance, probable proof is brought of a state of facts tending to criminate the accused, the absence of evidence tending to a contrary conclusion is to be considered,—though not alone entitled to much weight; because the burden of proof lies on the accuser to make out the whole case by substantive evidence. But when pretty stringent proof of circumstances is produced, tending to support the charge, and it is apparent that the accused is so situated that he could offer evidence of all the facts and circumstances as they existed, and show, if such was the truth, that the suspicious circumstances can be accounted for consistently with his innocence, and he fails to offer such proof, the natural conclusion is, that the proof, if produced, instead of rebutting, would tend to sustain the charge. But this is to be cautiously applied, and only in cases where it is manifest that proofs are in the power of the accused, not accessible to the prosecution.
To the same head may be referred all attempts on the part of the accused to suppress evidence, to suggest false and deceptive explanations, and to cast suspicion, without just cause, on other persons: all or any of which tend somewhat to prove consciousness of guilt, and, when proved, to exert an influene *317 against the accused. But this consideration is not to be pressed too urgently; because an innocent man, when placed by circumstances in a condition of suspicion and danger, may resort to deception in the. hope of avoiding the force of such proofs. Such was the case often mentioned in the books, and cited here yesterday, of a man convicted of the murder of his niece, who had suddenly disappeared under circumstances which created a strong suspicion that she was murdered. He attempted to impose on the court by presenting another girl as the niece. The deception was discovered and naturally operated against him, though the actual appearance of the niece alive, afterwards, proved conclusively that he was not guilty of the murder.
One other general remark on the subject of circumstantial evidence is this; that inferences drawn from independent sources, different from each other, but tending to the same conclusion, not only support each other, but do so with an increased weight. To illustrate this, suppose the case just mentioned of the wad of a pistol consisting of part of a ballad, the other part being in the pocket of the accused; it is not absolutely conclusive, that the accused loaded and wadded the pistol himself; he might have picked up the piece of paper in the street. But suppose that by another and independent witness it were proved, that that individual purchased such a ballad at his shop; and further, from another witness, that he purchased such a pistol at another shop. Here are circumstances from different and independent sources, bearing upon the same conclusion, to wit, that the accused loaded and used the pistol; and they, therefore, have an increased weight in establishing the proof of the fact.
I will conclude what I have to say on this subject, by a reference to a few obvious and well-established rules, suggested by experience, to be applied to the reception and effect of circumstantial evidence.
The first is, that the several circumstances upon which the conclusion depends must be fully established by proof. They are facts from which the main fact is to be inferred; and they are to be proved by competent evidence, and by the same *318 weight and force of evidence, as if each one were itself the main fact in issue. Under this rule, every circumstance relied upon as material is to be brought to the test of strict proof; and great care is to be taken in guarding against feigned and pretended circumstances, which may be designedly contrived and arranged, so as to create or divert suspicion and prevent the discovery of the truth. These, by care and vigilance, may generally be detected, because things are so ordered by providence,—events and their incidents are so combined and linked together,—that real occurrences leave behind them vestiges, by which, if carefully followed, the true character of the occurrences themselves may be discovered. A familiar instance is, where a person has been slain by the hands of others, and circumstances are so arranged as to make it appear that the deceased committed suicide. In a case recorded as having actually occurred, the print of a bloody hand was discovered on the deceased. On examination, however, it was the print of a left hand upon the left hand of the deceased. It being impossible that this should have been occasioned by the deceased herself, the print proved the presence and agency of a third person, and excluded the supposition of suicide. So where a person was found dead, shot by a pistol-ball, and a pistol belonging to himself was found in his hand, apparently just discharged; indicating death by suicide. Upon further examination, it appearing that the ball which caused the mortal wound was too large for that pistol, the conclusion was inevitable, that suicide in the mode suggested must have been impossible.
The next rule to which I ask attention is, that all the facts proved must be consistent with each other, and with the main fact sought to be proved. When a fact has occurred, with a series of circumstances preceding, accompanying, and following it, we know that these must all have been once consistent with each other ; otherwise the fact would not have been possible. Therefore, if any one fact necessary to the conclusion is wholly inconsistent with the hypothesis of the guilt of the accused, it breaks the chain of circumstantial evidence upon which the inference depends; and, howwer *319 plausible or apparently conclusive the other circumstances may be, the charge must fail.
Of this character is the defence usually called an alibi; that is, that the accused was elsewhere at the time the offence is alleged to have been committed. If this is true, — it being impossible that the accused should be in two places at the same time, — it is a fact inconsistent with that sought to be proved, and excludes its possibility.
This is a defence often attempted by contrivance, subornation, and perjury. The proof, therefore, offered to sustain it, is to be subjected to a rigid scrutiny, because, without attempting to control or rebut the evidence of facts sustaining the charge, it attempts to prove affirmatively another fact wholly inconsistent with it; and this defence is equally available, if satisfactorily established, to avoid the force of positive, as of circumstantial evidence. In considering the strength of the evidence necessary to sustain this defence, it is obvious, that all testimony, tending to show that the accused was in another place at the time of the effence, is in direct conflict with that which tends to prove that he was at the place where the crime was committed, and actually committed it. In this conflict of evidence, whatever tends to support the one, tends in the same degree to rebut and overthrow the other; and it is for the jury to decide where the truth lies.
Another rule is, that the circumstances taken together should be of a conclusive nature and tendency, leading on the whole to a satisfactory conclusion, and producing in effect a reasonable and moral certainty, that the accused, and no one else, committed the offence charged. It is not sufficient that they create a probability, though a strong one; and if, therefore, assuming all the facts to be true which the evidence tends to establish, they may yet be accounted for upon any hypothesis which does not include the guilt of the accused, the 'proof fails. It is essential, therefore, that the circumstances taken as a whole, and giving them their reasonable and just weight, and no more, should to a moral certainty exclude every other hypothesis. [! The evidence must establish the corpus delicti, as it is termed, or the offence committed as charged ; and, lis *320 case of homicide, must not only prove a death by violence, but must, to a reasonable extent, exclude the hypothesis of suicide, and a death by the act of any other person. This is to be proved beyond reasonable doubt.
Then, what is reasonable doubt ? It is a term often used, probably pretty well understood, but not easily defined. It is not mere possible doubt; because every thing relating to human affairs, and depending on moral evidence, is open to some possible or imaginary doubt. It is that state of the case, which, after the entire comparison and consideration of all the evidence, leaves the minds of jurors in that condition that they cannot say they feel an abiding conviction, to a moral certainty, of the truth of the charge. The burden of proof is upon the prosecutor. All the presumptions of law independent of evidence are in favor of innocence ; and every person is presumed to be innocent until he is proved guilty If upon such proof there is reasonable doubt remaining, the accused is entitled to the benefit of it by an acquittal. For it is not sufficient to establish a probability, though a strong one arising from the doctrine of chances, that the fact charged is more likely to be true than the contrary ; but the evidence must establish the truth of the fact to a reasonable and moral certainty; a certainty that convinces and directs the understanding, and satisfies the reason and judgment, of those who are bound to act conscientiously upon it. jÍThis we take to be proof beyond reasonable doubt; because if the law, which mostly depends upon considerations of a moral nature, should go further than this, and require absolute certainty, it would exclude circumstantial evidence altogether.
In every criminal prosecution, two things must concur; first, a good and sufficient indictment in which the criminal charge is set forth; and, secondly, such charge must be established by the legal proof. The sufficiency of the indictment in substance and form is a matter"of law, upon which, if drawn in question, it is the duty of the court to give an opinion. The general rule is, that no person shall be held to answer to a criminal charge, until the same is fully and plainly, substantially and formally, described to him. A good indictment, therefore, is necessary, independent of proof.
*321 This indictment contains four counts, which are four different modes in which the. homicide is alleged to have been committed.
To a person unskilled and unpractised in legal proceedings, it may seem strange that several modes of death, inconsistent with each other, should be stated in the same document. But it is often necessary; and the reason for it, when explained, will be obvious. The indictment is but the charge or accusation made by the grand jury, with as much certainty and precision as the evidence before them will warrant.” They may be well satisfied that the homicide was committed, and yet the evidence before them' may leave it somewhat doubtful as to the mode of death ; but, in order to meet the evidence as it may finally appear, they are very properly allowed to set out the mode in different counts ; and then if any one of them is proved, supposing it to be also legally formal, it is sufficient to support the indictment.
Take the instance of a murder at sea; a man is struck down, lies some time on the deck insensible, and in that condition is thrown overboard. The evidence proves the certainty of a homicide by the blow, or by the drowning, but leaves it uncertain by which. That would be a fit case for several counts, charging a death by a blow, and a death by drowning, and perhaps a third alleging a death by the joint result of both causes combined.
It may perhaps be supposed, that, in the long and melancholy history of criminal jurisprudence, a precedent can be found for every possible mode in which a violent death can be caused; and it is safer to follow precedents. It is true that these precedents are numerous and various ; but it is not true, that, amidst new discoveries in art and science and the powers of nature, new modes of causing death may not continually occur. The powers of ether and chloroform are of recent discovery. Suppose a person should be forcibly or clandestinely held, and those agents applied to his mouth till insensibility and death ensue. Though no such instance ever occurred before, the guilty agent could not escape.
Of course, I do not mean to intimate that these supposed *322 agencies were used in the present instance, but allude to them simply by way of illustration. But, if such or any similar new modes of occasioning death may have been adopted, they are clearly within the law. The rules and principles of the common law, just as when applied to steamboats and locomotives, though these have come into existence long since those principles were established, are broad and expansive enough to embrace all new cases as they arise. If, therefore, a homicide is committed by any mode of death, which, though practised for the first time, falls within these principles, and it is charged in the indictment with as much precision and certainty as the circumstances of the case will allow, it comes within the scope of the law and is punishable.
The principle is well stated in East’s Pleas of the Crown c. 5, § 13: — “ The manner of procuring the death of another with malice is, generally speaking, no otherwise material than as the degree of cruelty or deliberation with which it is accompanied may in conscience enhance the guilt of the perpetrator ; with this reservation, however, that malice must be of corporal damage to the party; and, therefore, working upon the fancy of another, or treating him harshly or unkindly, by which he dies of fear or grief, is not such a killing as the law takes notice of; but he who wilfully and deliberately does any act, which apparently endangers another’s life and thereby occasions his death, shall, unless he clearly prove the contrary, be adjudged to kill him of malice prepense.” This, the author proceeds to illustrate by a number of remarkable and peculiar cases.
In looking at this indictment, we find that the first count, after the usual preamble, charges an assault and a mortal wound by stabbing with a knife; the second, by a blow on the head with a hammer; and the third, by striking, kicking, beating, and throwing on the ground.
The fourth and last count, which is somewhat new, it will be necessary to examine more particularly. [Here the chief lustice read the fourth count, as inserted on page 296.]
The court are all of opinion, after some consideration, that *323 this is a good count in the indictment. From the necessity of the case, we think it must be so, because eases may be imagined where the death is proved, and even where remains of the deceased are discovered and identified, and yet they may afford no certain evidence of the form in which the death was occasioned; and then we think it is proper for the jury to say, that it is by means to them unknown.
We have already seen that a death occasioned by grief or terror cannot in law be deemed murder. Murder must be committed by an act applied to of affecting the person, either directly, as by inflicting a wound or laying poison; or indirectly, as by exposing the person to a deadly agency or influence, from which death ensues. Here the count charges an assault upon the deceased, (a technical term well understood in the law,-implying force applied to or directed towards the person of another,) in some way and manner, and by some means, instruments, and weapons, to the jury unknown ; and that the defendant did thereby wilfully and maliciously deprive him of life.
The rules of law require the grand jury to state their charge with as much certainty as the circumstances of the case will permit; and, if the circumstances will not permit a fuller and more precise statement of the mode in which the death is occasioned, this count conforms .to the rules of law. I am therefore instructed by the court to say, that, if you are satisfied upon the evidence, that the defendant is guilty of the crime charged, this form of indictment is sufficient to sustain a conviction.
We now come to consider that ground of defence on the part of the defendant which has been denominated, not perhaps with precise legal accuracy, an alibi; that is, that the deceased was seen elsewhere out of the medical college after the time, when, by the theory of the proof on the part of tho prosecution, he is supposed to have lost his life at the medical college. It is like the case of an alibi in this respect, that it proposes to prove a fact which is repugnant to and inconsistent with the facts constituting the evidence on the other side, so as to control the conclusion, or at least render it doubtful, *324 and thus lay the ground of an acquittal. And the court are of opinion that this proof is material; for, although the time alleged in the indictment is not material, and an act done at another time would sustain it, yet in point of evidence it may became material; and in the present case, as all the circumstances shown on the other side, and relied upon as proof, tend to the conclusion that Dr. Parkman was last seen entering the medical college, and that he lost his life therein, if at all, the fact of his being seen elsewhere afterwards would be so inconsistent with that allegation, that, if made out by satisfactory proof, we think it would be conclusive in favor of the defendant.
Both are affirmative facts; and the jury are to decide upon the weight of the evidence. When you are called upon to consider the proof of any particular fact, you will consider the evidence which sustains it in connection with that which makes the other way, and be governed by the weight of proof. Proof which would be quite sufficient to sustain a proposition, if it stood alone, may be encountered by such a mass of opposite proof as to be quite overbalanced by it.
In the ordinary case of an alibi, when a party charged with a crime attempts to prove that he was in another place at the time, all the evidence tending to prove that he committed the offence tends in the same degree to prove that he was at the place when it was committed. If, therefore, the proof of the alibi does not outweigh the proof that he was at the place when the offence was committed, it is not sufficient.
There is one other point remaining to which it is necessary to ask your attention; and that is the evidence of character. There are cases of circumstantial evidence, where the testimony adduced for and against a prisoner is nearly balanced, in which a good character may be very important to a man’s defence. A stranger, for instance, may be placed under circumstances tending to render him suspected of larceny or other lesser crim e. He may show, that, notwithstanding these suspicious circumstances, he is esteemed to be of perfectly good character for honesty in the community where he is known: and that may be sufficient to exonerate him. Bui *325 where it is a question of great and atrocious criminality, the commission of the act is so unusual, so out of the ordinary course of things and beyond common experience; it is so manifest that the offence, if perpetrated, must have been influenced by motives not frequently operating upon the human mind; that evidence of character, and of a man’s habitual conduct under common circumstances, must be considered far inferior to what it is in the instance of accusations of a lower grade. Against facts strongly proved, good character cannot avail It is therefore in smaller offences, in such as relate to the actions of daily and common life, as when one is charged with pilfering and stealing, that evidence of a high character for honesty will satisfy a jury that the accused is not likely to yield to so slight a temptation. In such case, where the evidence is doubtful, proof of character may be given with good effect.
But still, even with regard to the higher crimes, testimony of good character, though of less avail, is competent evidence to the jury, and a species of evidence which the accused has a right to offer. But it behooves one charged with an atrocious crime like this of murder to prove a high character, and, by strong evidence, to make it counterbalance a strong amount of proof on the part of the prosecution. It is the privilege of the accused to put his character in issue or not. If he does, and offers evidence of good character, then the prosecution tnaj give evidence to rebut and counteract it. But it is not competent for the government to give in proof the bad character of the defendant, unless he first opens that line of inquiry by evidence of good character.